Case 15-3797, John Ruiz-Bueno III et al. v. Maxim Healthcare Services Inc. et al. Oral argument, 15 minutes for the plaintiffs, 15 minutes to be shared by the defendants. Mr. Russell for the appellants. You may proceed. Your Honors, the appellants have reserved 3 minutes for rebuttal. Fine. May it please the Court, my name is Joe Russell. It's my pleasure to be here this morning representing the plaintiffs' appellants in this matter, John Ruiz-Bueno III and Michael Gay. An issue in this appeal is the applicability of equitable doctrines to toll or extend the statute of limitations and whether the underlying complaint was timely. Particularly with respect to the discovery rule, this Court recently determined in a State of Abdullah v. Arena that once the plaintiff knows he has been hurt and who has inflicted the injury, the claim accrues. Here, the evidence that plaintiffs had at the time of the filing of the related lawsuit, which related only to the deputies and only to their wrongdoing, was a redacted IAB report that either made no reference to the defendants in this particular action, or if it did, indicated no involvement whatsoever with Mr. Peterson. It was through discovery under the Federal Rules of Civil Procedure in that related action that eventually an unredacted IAB report was produced, and that was produced in the spring of 2013. The case that you rely on, Abdullah, is an unpublished case. Correct. Are there any published cases saying that you have to know the identity of the actual defendant? There are no published cases in this circuit that say that, but I would note that what was quoted in Abdullah was the United States Supreme Court's decision in Kubrick for 44 U.S. 111-122. Well, why not, if that supports your position, why not cite that rather than an unpublished case? Sure. I mean, arguably, that case could have been cited, sure, but it is, in fact, in the brief, it's quoting that portion of Kubrick standing for that proposition. And I think the way that this Court addressed the issue in Arena as well, even if it is an unpublished decision, shows why the discovery rule should apply here, because in that case, it says, this is not a case where the identity of the defendants and at least the possibility that the shooting was wrongful were not known. And I think it's important to remember here that we didn't have the identity of the defendants in this case. But you filed suit in 2012 against something like 56 defendants, including some John Doe defendants, and that claim, as I understand it, those claims raised medical issues having to do with the death of the decedent, right? So if you named John Doe's, why couldn't those John Doe's be filling in for these defendants here? I think that's an interesting question. But the difference between naming a John Doe defendant and when a claim accrues, I think, is important. Just because these defendants at some point in time in that litigation could have been substituted does not mean that the claim against them pursuant to the discovery rule had already accrued. So it is true, but at that point in time, there was no information available about these defendants. Now, appellees have suggested that one thing that could have been done was to file an action for discovery under Ohio law. But plaintiffs in that action were already using the federal rules of civil procedure to obtain that discovery. And equitable tolling, for instance, doesn't require maximum feasible diligence. It requires reasonable diligence. And appellants submit that by using the federal rules to obtain the identities of these defendants, which occurred in the spring of 2013, the action was filed within two years of that date. So the discovery rules kind of has a judicial policymaking embedded in it. And one concern I have about your position is we want to create incentives once there's an injury for people to go figure out how this happened, why, and who did it. And it seems to me your way of looking at the discovery rule here would really remove quite a few of those incentives. And that doesn't seem good for plaintiffs or defendants, frankly. I think there are two competing policies, Your Honor. I think on one hand, you want to create incentive to investigate a claim. On the other hand, you don't want plaintiffs going out and filing claims with no factual basis. And here there was investigation. The investigation did happen. I think it's important to note that when this case started, or when Mr. Peterson died. Some of the nurses named in this second complaint were identified in the report. They were identified in the unredacted complaint. Originally, the only people who were, there were a few nurses only, whose identities were revealed in the redacted IAB report. So then you were put on notice that there were medical people and not simply deputies who had been involved in what happened to the deceased. I disagree with that statement because there's no indication. How could you disagree with it? There was no indication in that report that these people ever even encountered Mr. Peterson. All of their involvement was redacted. It was names on a page. Well, the next thing you do is ask, what are you covering up here? I need to know the names of those people. I need to know what medical folks were invited into this, who had a part of it. I mean, you don't, 53 deputies. Surely somebody figured out that there were medical people involved here. I agree with you, Your Honor, that that did happen. That's precisely what happened during the discovery process in the related action. It was the use of the federal rules to uncover that information. Once that information was procured, then it has to go through our medical experts. And as in what happened in Akers, which was a state court case involving medical malpractice, which distinguished its decision in Flowers, one expert had concluded that this was a sudden medical emergency. That was what our initial expert in that case had concluded. Meaning that the medical personnel, this was a sudden cardiac event. That was consistent with what the coroner's report said and what the Franklin County Sheriff's Office originally told Mr. Peterson's family about his death. So, our initial expert agrees with that conclusion that these medical personnel couldn't have prevented this sudden cardiac emergency. Through the retention of another expert in litigation, when we have all of this information, it later becomes the case that he put on this additional weight. That this was not a sudden emergency and that there was neglect involved. And at that point is when the people identified in the unredacted report were sued within two years of learning of their identity and some form of involvement with Mr. Peterson. So, you got the unredacted report in 2013, in the summer of 2013. What date was that handed over to you? The precise date I can't give you over the top. Well, that's very important. Well, I agree, but the point is it was spring 2013. It was spring. So, two years from that date would be the spring of 2015. This lawsuit was filed in December 2015. Well, when you got the unredacted copy of the investigative report, you were still in litigation in the first suit. That's correct. And summary judgment was not entered in that suit until November of 2014. Correct. So, why weren't you about filing an amended complaint, bringing these people in? You now know who they are. Right. There was another action. The discovery deadline, by the time all of this wrongdoing and the claim is put together. Why didn't you file an amended complaint once you got the unredacted report? Right away? Because at that point, frankly, we were still going through the process of identifying the wrongdoing with our expert witnesses. At some point, I mean, this is a deliberate indifference case. Well, there's spring of 2013 to summary judgment in November of 2014. Correct. But that doesn't change when the claim accrues. It doesn't change the diligence that was being exercised in investigating the claim during that time period. Let's just say you win here. I don't understand why, given our circuit's recent decision in the first case, they can't say res judicata when it comes back. I mean, res judicata is about the nucleus of common operative facts. Surely that applies here. I mean, this looks so much like splitting causes of action to me, and I don't even know what you're going to do about that on remand. Well, res judicata would involve an identity of parties and interests. No. It applies to every claim you did bring and should have brought. These are entirely different defendants. From the nucleus and our operative facts this death. But you're saying that none of these defendants were defendants in the first case in terms of the individuals. That's correct, Your Honor. No, that's right. I understand that. I mean, that's why we're here. But that doesn't prevent res judicata from applying. You're not allowed to bring a case against one defendant one day, lose, then bring a whole new case against another defendant the next day, if both cases arose in the same nucleus of operative facts, right? I mean, you do agree with that. I suppose that would take into account what the scope of the two cases are. The issue hasn't been briefed in terms of claim or issue preclusion, but it would depend on the scope of the cases. I mean, this case involves the negligence of the medical providers. The focus of that first case was on two things, inhumane conditions of confinement, unsanitary conditions of confinement, violation of the Eighth Amendment, and what happened on the day that he died, what care was provided to him on the day that he died by deputies. The case did not involve what medical personnel did throughout the course of Mr. Peterson's month-long jailing. So the naming of the John Does in the first case were with respect to different wrongs, and so they couldn't possibly have been these particular individuals. That's correct. The reason the John Does were named was in case additional deputies came up that we were unaware of, and that's the reason those weren't utilized. Wasn't it always possible that there were unidentified medical people involved? Anything is possible, but I think it goes back to the diligence of investigating the claim. You have to have some kind of basis, particularly for suing a defendant for deliberate indifference, where the standard under Farmer is something akin to criminal recklessness. And if experts are telling us at various points in time, it looks like this wasn't something the medical personnel could have prevented, and then later it comes up, late in the game, that this was the case. I mean, by that point, discovery was about to close, everything was closed, and we're getting involved in the summary judgment brief. There's a Supreme Court case, Rotella v. Wood, that has the language, discovery of the injury, not discovery of the other elements of a claim, is what starts the clock. Why isn't the injury the death? I think that language is taken out of context a lot. The injury, there has to be some element of wrongdoing to put someone on notice that something happened. I think here the equitable factor is involved, too. The coroner is saying this was a man who died of natural causes, not neglect, not something akin to criminal recklessness, and all of a sudden this nothing involving wrongdoing whatsoever comes out until much later in the ballgame. With the unredacted IEB report, there was diligence in procuring the unredacted version of that report, and within two years of that time, these defendants were sued. So I don't think, I know what that language says, but I don't think that's the way that the courts have treated that language. Your red light is on. Thank you. Presiding Judge Moore, Your Honors, and may it please the Court. Assistant Attorney General Mark Davis, on behalf of the State Appellees, Twin Valley Behavioral Health Care, Dr. Delaney Smith, Dr. Adam Wooten, and Ms. Tara Talrico. Before I begin, I would like to reserve five minutes of time for Mr. Tyler Tarney, who represents Dr. Tilley, and I'd like to reserve an additional three minutes of time for Mr. Thomas Himmelsbaugh, who represents the Maxim defendants. So that gives you seven. That's correct. Okay. Thank you, Judge Moore. Thank you, Matt. Could you tell me, Counselor, the unredacted report Counsel says was available in the spring of 2013. Yes, Your Honor. Would it have been possible to amend the complaint at that point? Yes, Your Honor, it would have been. I believe the date that Counsel was looking for was May 31, 2013. It certainly would have been a possibility that the appellants could have amended the complaint, and, in fact, they should have at that particular point in time, but instead they waited over another year to bring lawsuit against the State Appellees. And your side wouldn't have objected to the late nature of the proposed amendment of the complaint? Well, we may have objected, Your Honor. However, we would note that the interesting thing here is that the identity of the tortfeasors was discovered within the statute of limitations period. If you take the assessment of either Judge Frost in the Southern District, or if you look from the cognizable event, which would have been the death of Mr. Edward Peterson on September 4, 2011, if they knew whom the tortfeasors were in that summer, they could have filed within the statute of limitations and still been timely. The Southern District of Ohio correctly determined that appellants' civil rights action and state law claims are barred by the statute of limitations for three reasons. First, appellants filed suit over 39 months after any of the appellees provided medical or psychiatric care to the decedent. Two, the discovery rule is inapplicable to this case. And three, appellants have failed to cite any extraordinary circumstance which would justify equitable tolling, and they did not pursue their claims with reasonable diligence. So I'm thinking of this kind of argument on the equitable tolling. Suppose they get the unredacted report. They realize they've got some substantial medical claim possible. They take it to an expert within a week or two and get an answer. They file a motion to file an amended complaint. You oppose it. The district court denies the right to file an amended complaint. Then we might have an equitable tolling situation, mightn't we? I would agree with your assessment, Judge Daughtry. And even if they had filed a separate complaint, they still would have been timely. Within the time. They still would have been within the time. They had from May until September under your theory? That's correct. The courts have been clear that death or the injury is certainly what starts the clock. The purpose of the discovery rule is to protect claims for those plaintiffs who don't have a manifestation of the injury. They're unaware that they're actually injured, and that exception is set to protect that particular class of defendants. What about the language in this Abdullah case? Granted it's not published, but it does say the identity of the tortfeasor or something to that effect. The Arena case is citing to the Kubrick case. And if you look at the Kubrick case in its larger context, what the court was doing in that particular portion of the analysis is drawing a distinction between a plaintiff who is aware of the injury and simply unaware of their legal rights versus a plaintiff who is unaware of those rights. The court was not saying that the identity of the tortfeasor is part of the test. And what they were saying is essentially that a plaintiff, I'm reading from Kubrick now, armed with the facts about the harm done to himself, can protect himself by consulting people in the medical and legal community. And to excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the statute of limitations. Judge Moore, you noted Rotella. In 2000, the United States Supreme Court said that concerning the discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of the claim, is what starts the clock. The court continued and said, we have been emphatic about that particular point. And that in the medical malpractice context, where the cry for the discovery rule is the loudest, that the justification for the discovery rule does not extend beyond the injury itself. There were other things that appellants could have noticed. This particular redacted internal affairs report, that was something that was aimed at the target, that was targeted at the deputies. However, the death of a 48-year-old man, who was having his health managed, this was a pre-existing heart condition from 2006. There was an autopsy report that was made public on October 21st of 2011. And in that report, there's a toxicology report. Now, hyperoxirispridone is a schizophrenic medication that was detected in his blood system. But there was no heart medication present, according to that toxicology report. So, certainly his family ought to know at that particular point in time, that he's died from a heart condition, and he did not have his heart medication. They had ample evidence. There was a news story in the spring and summer of 2012, that appellants noted in both the complaint and in their brief to this court, in which they noted the wrongdoing that occurred in Mr. Peterson's death. Was it revealed that he had gained 30 pounds of edema fluid in that month in the jail? Well, it would certainly be apparent to his family at the time of funeral service, but it was also indicated in the autopsy report itself. That was in the autopsy? He had gotten to 260 pounds. That's correct. And I would just remind the court in the remaining time that I have, that statutes of limitations are not merely technicalities. They've been long regarded as something that's fundamental to a well-ordered judicial system. They are found and approved in all systems of enlightened jurisprudence and represent a pervasive legislative judgment that is unjust to fail to put the adversary on notice to defend within a particular point in time. And over time, the right to be free from stale claims triumphs over the right to prosecute them. In light of that, I would think that it's hard to see here how appellants reasonably pursued their claims with diligence. Even as Judge Frost said, regardless of whether the inquiry focused on Peterson's knowledge or that of his estate, and regardless of whether the statute typically begins to run at the injured person's death or at some other point, it cannot be disputed that appellants knew of and understood Peterson's injury on September 4, 2012, when they filed a lawsuit for failure to provide inadequate medical care. By that point, appellants knew of the injury that Peterson allegedly suffered and retained counsel for the purpose of rectifying that injury. It was their job to identify the tort feasors in this matter. And for the aforementioned reasons and those cited in their brief, the State Appellees respectfully request an affirmation of the decision below. Thank you, Your Honor. Thank you. May it please the Court, Tyler Tarney on behalf of Appellees Dr. Tilley and Behavioral Science Specialist, LLC. Dr. Tilley is a psychologist who conducted a court-ordered competency exam to determine whether Peterson was competent to stand trial before his death. My time will focus on our unique position in relation to the other appellees, providing at least three additional reasons showing why the estate's claims are barred. First, the municipal court records regarding Dr. Tilley's competency exam were publicly available immediately after Peterson's death. Second, Dr. Tilley is absolutely immune because competency exams are quasi-judicial functions. Third, there are no facts that could plausibly show how a psychologist's failure to diagnose congestive heart failure is a breach of any medical standard of care, much less a constitutional rights violation. How many days before the death did your client see? Three, Your Honor. Three days before the death? Yes. So we could get ourselves into a situation of where a layperson would have appreciated that the decedent was in dire straits and should have, if the layperson was being employed in some fashion at the prison, would have some duty, right? Absolutely, and those records were public records, part of the municipal court docket, and that's really what distinguishes my clients from the other appellees and provide additional bases for affirmance is that there were 212 days from the time of Mr. Peterson's death until this redacted report on April 6, 2012, where those records were available. They could have been requested, and they weren't. With respect to the – Out of curiosity, I know it's not been briefed, but did anyone raise re-estudicata down below? It was not raised in the briefings below, but I don't disagree with that argument. I think that's an additional basis for affirming the district court's decision. You're saying that if there are two people who each cause some harm to some victim, that the victim has to sue both people in the same lawsuit and cannot sue them one at a time. Is that what you're saying? I'm saying that once the identity of the second party who could potentially be at fault is – But you're saying there's a mandatory joinder? If you're making that statement, aren't you saying there's a mandatory joinder of defendants, even though they might have independently acted to cause the harm to this particular victim? Based on the fact that they arose from the same death, virtually the same allegations and the same claims, yes, Your Honor. And what really distinguishes Dr. Tilley in this circumstance is the fact that the redacted report that's been the emphasis of the appellate's argument doesn't even contain Dr. Tilley's name. Therefore, there's no reason that the redactions may have redacted his wrongdoing. He wasn't even mentioned in that report. Rather, the records showing his involvement were immediately available after Mr. Peterson's death. For over two years after the numerous events that Mr. Davis mentioned, the estate was obligated to take steps to protect its rights. At each point, it could have collected the court and medical records and had them reviewed by experts. It made no attempt to do this. Worse, within the statute of limitations in summer 2013, the estate admits that it received the medical records that disclosed the appellee's involvement. Between then and the two-year period, they could have amended their complaint, named the John Doe defendants, and asserted timely claims. The estate improperly focuses on what information it was given, what it realized, and what it knew based on information that others provided. This inattention, idleness, and indifference defies the purpose of the statute of limitations, which is designed to encourage diligence. The estate assumes a plaintiff can take a completely passive role in learning of a claim until it receives in hand information regarding the injury, the tortfeasor's identity, and the wrongdoing. This approach is unworkable, it invites abuse, and it could extend a defendant's potential liability into perpetuity. The estate's passive conduct does not warrant the extreme remedy of equitable tolling either. There's no allegations of concealment by any of the appellees. It's undisputed that the estate retained counsel within the limitations period, and courts have repeatedly rejected equitable tolling when counsel has been retained within the limitations period. Dr. Tilly is also absolutely immune from liability. The limited scope of his involvement in a court-ordered competency exam was recognized in this court's February 2nd decision. Because court-ordered competency exams are so intertwined with the judicial process, they are routinely considered quasi-judicial functions entitled to immunity. And this makes sense. Competency exams are an integral part of the criminal justice system. Absent immunity, these representatives might not be inclined to take on those exams or do those evaluations. It precludes suits in their official and individual capacity. And, as I mentioned before, there's no facts that could plausibly show how a court, how a psychologist's failure to diagnose congestive heart failure constitutes the breach of any medical standard of care, much less arises through a constitutional rights violation. Your red light is on, so if you want your colleague to have time... Yes, Your Honor. ...yield to him. May it please the Court, my name's Tom Himmelspa. I'm here on behalf of Maxim Healthcare Services and six of its nurses. I'll be brief. The posture of Maxim and its nurses is somewhat different from the other defendants in that, as has already been noted, they were mentioned in the internal affairs report, the redacted version that was, that appellant concedes he had received. They were mentioned in the redacted version? In the redacted version. Not only mentioned, actually, by my count, mentioned 20 times. That report also refers at 12 different places to unidentified nurses. It refers to the medical staff. It refers to Mr. Peterson's medical record. At page 12 of their brief, appellant writes that they didn't even know that there were medical personnel involved, and that statement doesn't fit the facts. And when was the redacted version given? I believe it was timed sometime around when the news report came out, but I don't have that date. It was before they filed the first lawsuit. So that would mean, then, that the two-year statute of limitations had passed if you were using the redacted version's disclosure date as your date of accrual? That's correct. Is that the argument that you're making, that that should be the date of accrual? At the latest, I think there's an argument, certainly, that the event of the death would have been the injury if the appellant is claiming that Mr. Peterson died as a result of having received inadequate medical care, as they allege in their first lawsuit. So what do you do with all this language in these various cases that would indicate that there could be an argument that it is when you know the identity of the defendants? Well, I think in our case, we have the identity of the defendants already disclosed. We have the nurses that were identified in that report. They had the opportunity, then, to request the medical record. There's no assertion that there was such a request made. Did they ever request the medical record, or when did they request it? I don't know that they did, but there's been no assertion that that request was made and refused. They had the option, too, of bringing an action for discovery in a state court, and they could have obtained it through those means. In summary, I believe that the district court was correct in dismissing Maximin and its nurses based upon a statute of limitations. Thank you. I'm not sure. I didn't write down how much time you wanted for rebuttal. Three minutes, Your Honor. Thank you. May it please the Court. A lot of what I was hearing from the appellees in this case involved facts that are simply outside the record at this point in time. On the face of the complaint, there's no mention of what the family would have known had it noticed Mr. Peterson gained weight, or even that they knew he was on any kind of medication. Mr. Peterson, as it turns out, was a mentally ill man who was trying to rekindle his relationship with his family, but the idea that the estate would have noticed these things or those things. But the heart problem was important, right? A heart problem is an important thing. And if he's not on heart medication, why isn't that? It seems like a pretty relevant point. The question is, what would the estate have known? What would these people have known about Mr. Peterson at that time? They knew he died, and they have an autopsy, and you have people assess the autopsy. That seems to me not too much to ask. The autopsy came up with no wrongdoing, and the autopsy was assessed. But all you need to do is get a doctor to say if someone dies from a heart problem and there's not heart medication being administered or in the bloodstream, why isn't that suggestive of negligence? And that's one thing that I'm getting at. We did have a doctor who did look at this who did not see the 30-pound weight gain. It was only when we hired a second doctor, Dr. Stuart Grossian, when these things were pointed out to our first doctor, when everyone could go back and look and say, okay, there was this wrongdoing. There was this wrong associated with the people who were identified in the report. But the first doctor was a doctor hired by your clients? That's correct. So isn't that a really fundamental problem that essentially you're going out later on finding a second doctor who may be a better doctor, but shouldn't the fault be on your side as opposed to the various defendants? The second doctor, I would note, was actually a psychologist. He didn't have the same specialty as the original doctor. But that's really not an answer to Judge Moore's question. I'm sorry, Your Honor. But the fault of the inadequacy of the first expert that you hired should be your fault, not the fault of the defendants. In other words, you shouldn't get extra time because you happen to hire a less than adequate expert the first time around. I wouldn't agree with that because I think the function is on what's equitable. Just because this doctor might not have been perfect, the client was doing something to investigate this claim, doing the right thing, and retained additional experts along the way. So, I mean, I don't think, and keep in mind, based on the court's decision, the district court's decision, this action is untimely by all of five months. We're not talking about a year. So the obtaining of the second expert, did that happen between May and September of 2013 after the unredacted report was released to you? That was after that time period, after the unredacted report. Well, you now know from the unredacted report that you've got something. Why wait to get an expert in? Well, we had an expert, the original expert we had. All right. Thank you for your time, Your Honor. Thank you. I'd ask that the district court's decision be reversed. Thank you all for your argument. The case will be submitted. Would the clerk call the next case, please?